Would you let your colleagues get set first? I will, Your Honor. Thank you. Mr. Urquhart. Urquhart. Urquhart, Your Honor. Thank you. Mr. Urquhart. Thank you. You may proceed. Thank you, Your Honor. Again, Quentin F. Urquhart, Jr. on behalf of Remington Arms, L.L.C. This case presents the question of whether the lower court improperly nullified the clear and unambiguous intent of the Louisiana legislature to limit the available theories of products liability recovery in certain cases involving firearms. As this Court is aware, products liability actions in the state of Louisiana are governed by the provisions of the Louisiana Products Liability Act. The LPLA establishes four exclusive theories of products liability recovery, defect in manufacturing, defect in design, failure to warn, and breach of an express warranty. In 1999, the Louisiana legislature amended the LPLA to specifically address the liability of firearms manufacturers. House Bill 1639 was filed in response to a lawsuit, the Morreale lawsuit, in which the City of New Orleans sought to shift the responsibility to pay for expenses associated with shootings in the city by imposing liability on firearms manufacturers. The Morreale lawsuit sought to achieve through litigation what the city could not accomplish through legislation. The legislative history for House Bill 1639 makes it clear that the primary motivation, the overarching motivation, was to ensure that no new regulations and no new requirements could be imposed on firearms manufacturers unless those emanated from the legislature and not through a court decision. As expressly noted in that legislative history, and I quote here, the bill was, quote, on guns. From this point forward, any interpretation of this statute needs to be viewed through that lens, that it was the intent of the legislature to make it real clear that products liability law was never intended to impose additional regulation on firearms manufacturers. With that intent in mind, Section 2800.60b was enacted, which provides that no firearm manufacturer or seller shall be liable for any injury, damage, or death resulting from any shooting injury by any other person unless the claimant proves and shows that such injury, damage, or death was proximately caused by the unreasonably dangerous construction or composition of the product as provided in R.S. 9,2800.55, which is defect in manufacturing. The court went out, excuse me, the law went out of its way to specify in single .55, defect in manufacturing. Thus, after the statute was passed, in cases where a person is injured as a result of a shooting by another person, the legislature has decided that liability can only be proven under a theory of defect in manufacturing. And this is completely consistent with the intent behind the law, because to allow recovery under a theory such as defective design, or to allow recovery under a theory like failure to warn, would be to introduce the possibility that a third party, such as a judge or jury, could impose additional regulations on guns. And this is precisely what the legislature knowingly decided to eliminate. The factual background of this case in particular fits the circumstances of Section B to a T. It falls within the four corners of it. Here, the plaintiff was injured when she was accidentally shot by her father while they were walking through the woods at night pursuing a wounded deer. Apparently, as they were moving through some heavy brush, the rifle her father was carrying was hit by a tree branch and it fired, hitting the plaintiff in her car. This injury occurred due to the direct violation of numerous safe gun handling rules, including the fact that the father was walking through the woods at night carrying a loaded gun with a round chambered. There was no need for this. There was no need for him to be able to shoot this gun instantaneously when they were searching for a wounded animal. Second, he was walking behind his daughter without the safety on the rifle on. Third, and perhaps most significantly, he failed to follow the first rule of safe gun handling, always keep the muzzle pointed away from other people. If the father in this case had followed any one of those rules, this injury would not have happened. An investigation of this accident by the Louisiana Department of Wildlife and Fisheries noted that there were two factors that contributed to this accident. Number one, the gun got caught on an object. And number two, the accident occurred due to careless or reckless handling of the firearm. And afterwards, they sent the firearm to the Louisiana State Police Lab, and they attempted to see if they could replicate this firearm firing without the trigger being pulled. And they could not. The only way this gun would fire was if the trigger was pulled. And this was consistent with the history of this firearm, which had never gone off without the trigger being pulled. Nevertheless, despite all that testing, the plaintiff in this case brought a products liability action in which they alleged initially three theories, defect in manufacturing, defect in design, and failure to warn. However, as the case progressed, the plaintiff's own expert had to admit there is no defect in manufacturing here. And the plaintiff later, on her own, realized, I have no failure to warn claim here. I dropped that. So the only theory of liability left in this case was a defect in design. And when the case was reduced to that, Remington said, wait a minute, Section 60B eliminates that theory of liability. The parties filed cross motions for summary judgment, and that's how we are here today. In an attempt to avoid the clear and unambiguous language of Section .60, the plaintiff basically raised two arguments. Number one, she argues that the statute is ambiguous. Second, she argues that the statute reaches an absurd result. Neither of those have merit, and let me address each of them. First, on its face, Section 60B is not ambiguous. It clearly says that when a person is injured due to a shooting injury by another, the firearms manufacturer can only be liable under a theory of defective manufacturing. It could not be any clearer. But to create an ambiguity, what the plaintiff says is, well, let's look to other parts of this statute. Second, this approach violates at least three fundamental rules of statutory construction. First, the plain language rule, which says that when a provision is clear and unambiguous, it is to be applied as written without reference to other parts of the statute. Their approach also runs counter to the rule that a preamble, which is what Section A of the statute is, that's where they think the ambiguity gets created. From Section A, it is not part of the law and it cannot be used to create doubt or uncertainty. Counsel, I find that somewhat of an inconsistent argument. You started by saying the most important thing for us to be considering is what the intent of the legislature was, and you went through that intent. Well, so Part A is talking about what the intent was, and it's talking about no liability so long as the design and the manufacturer were properly done. So it seems to me you don't want the intent to be that important. You want the plain language of B to control over the intent, do you not? No, Your Honor. I think it's actually both, that the order has to be clear. But doesn't Louisiana statutory construction say you look at the plain language of the statute and you don't look at anything else? So why are you talking about intent? Well, because I think ultimately, Your Honor, when you consider the intent, and I will point this out, the specific legislative history of this points to the fact that they are not going to do exactly what it says. But why is that relevant if you think the language is, and you even give me two words for it, clear and unambiguous, as opposed to just unambiguous? I don't know what the difference is, but nonetheless, it seems to me that it's just an inconsistent argument. Intent is either important or it's not. It seems to me what you really are arguing is that the plain language is all that controls and, by the way, it is consistent with what the legislature was trying to do, but that doesn't really matter because the language is clear and unambiguous. That is exactly what we are saying, is that the language is clear and unambiguous in section B. It should be applied the way it is. The plaintiff's attempt to create ambiguity is by referring to other sections of the statute. And then all I'm simply saying is if this Court decides that there is some reason to go beyond the plain language of this statute, if the Court wants to even entertain hypothetically the question of whether or not this statute is ambiguous or not, the legislative history still supports this outcome. And the reason that the legislative history does is because of the intent behind that, which was to curtail the theories of products liability recovery that could be used against a manufacturer. One of the other arguments I would like to point out as to why this statute is not specifically in the briefing, but it was something that occurred to me, which is this, is that if you're going to argue something is ambiguous, you're saying that under an alternative interpretation of the statute, I win. Here, there is no alternative interpretation of section B under which the plaintiff wins. None. The plaintiff cannot win under any alternative interpretation of section B. What the lower court did was to say, I think it's ambiguous, so now I get to ignore it. You cannot do that. You've got to say if there's an ambiguity, then you've got to look at the various interpretations and decide which interpretation makes the most sense in conformance with the purpose of the law, which is what Civil Code Article 10 says. And the purpose of this law was to restrict.  I anticipate that question, Your Honor, and no, I don't think this case does need to be certified to the Louisiana Supreme Court, and let me tell you why, because the principles that our Supreme Court is going to apply in deciding whether or not this law should be applied as written are no different than what this Court can apply. They are the ordinary rules of statutory construction that must be applied. There's nothing in all due respect to our Supreme Court that it's going to add that is unique from its perspective on statutory construction that this Court cannot already do. The Supreme Court would look at the plain language of the statute. It would look to see whether or not the section that's claimed to be ambiguous is in the preamble. It would eliminate that. It would look at the specific over the general and say this statute is specific, it's general. It would also look to see what the purpose of the statute was. All of those things this Court is perfectly capable of doing without certifying the question to the Louisiana Supreme Court. Looking just very briefly, since Judge Southwick brought it up, at the legislative history, if you look at the colloquy that occurs here between Justice — I mean, between Senator Henkel and Dardenne, they specifically consider whether section B should be amended to include a design defect claim. And they didn't do it. They did not end up including another exception for design defect. And they could have easily done it the same way they did for manufacturing defect by including a specific reference to the statute number. They could have said we're going to allow design defects under 2800.56 the same way they did with .55, and they didn't do it. Few principles of statutory construction are more compelling than the proposition that the legislature does not intend, through its silence, to enact statutory language that it has expressly considered and rejected. This is the rejected proposal rule, and it's clearly not within the province of a court to add in that language after the legislature considered it and rejected it. But that's effectively what happened here. Finally, let me address, as my time is almost up, the absurdity argument. This primarily is based on the contention that, well, you're going to allow a design defect claim if a person injures himself, but if another person injures you, you don't get that claim. There were some perfectly rational — excuse me — rational reasons why the legislature could have drawn the line where they did, primarily because they wanted to put responsibility for safe gun handling where it belonged, on the person handling that firearm, because they knew that even if there was some alleged defect with the gun, if you handle that gun safely, no one is going to get injured. This legislature had the authority to completely eliminate any cause of action for defective design. They didn't do it. They drew the line where they did. It's no different than the legislature drawing a line and saying you only have a year to file a tort claim. They drew the line there. That doesn't make it absurd. It's where they drew the line. The plaintiff in this case is confusing absurdity with the fact that she claims the statute is unfair to her. Thank you. Kennedy. Was there some evidence that this weapon was — had dirt in the trigger or something that might have contributed to the — No, Your Honor. My understanding is that there's no evidence of that. That was their theory. The expert's theory on the plaintiff's side was that in this particular part of the trigger called the trigger connector, some dirt could conceivably get underneath that and cause an inadvertent engagement of the gun. However, when this gun was examined later on CT and X-ray, no evidence of any dirt was found in there. That's their theory. I see. Would that have been a manufacturing defect if there was dirt in there? No, Your Honor. It would not have been a manufacturing defect. There was no evidence that if any dirt existed, it existed at the time it left the manufacturer's control. I see. Under this statute, what happens if someone injures himself with a weapon like this? If someone — if someone injures themselves, Your Honor, the legislature has made a determination and decision that they can bring an ordinary product's liability claim, including a theory of defective design and failure to warrant if they injure themselves. And so they drew the line that if one person — if another person injures you, we're going to say we want to put the responsibility on safe gun handling of that person. And remember the Morial case. Why is that absurd? It's — Your Honor, it's not absurd because they wanted to place the responsibility there. The fact that they decided that a person who is handling a gun on their own can bring the case isn't absurd either. They've just decided that is where they were going to draw the line because the primary focus of the statute was to address the Morial case, which was shootings between two different people, shootings between another person. So there's no absurdity there. It's simply where the legislature decided to draw that line. Your Honor, I think my time is up. I will respond to other questions. Thank you very much. Mr. Monsies? Yes, sir. To please the Court, my name is Tim Monsies. I represent Precious Seguin. Your question was a good one, Judge Dennis. It is absolutely absurd to think that the legislature crafted a statute that protects third-party shooters but doesn't protect somebody when they shoot themselves. There is absolutely no logical basis for differentiating the clear ambiguity in Subsection B that would allow somebody to sue for a defective product under any theory if they shoot themselves, which Mr. Urquhart confirms essentially, but to differentiate that and say that you cannot sue if you're being shot by a third person. Subsection B is an inartful attempt, but an attempt by the legislature to clarify that they were not trying to foreclose truly defective product claims. You have to look at what was going on at the time. There are 14 states in the United States that have some form of statute that you could say is somewhat similar to what we're seeing here with the statute at issue. None of those, including this one, would preclude the type of cause of action for a true product liability case. What was going on in the 1990s that we saw in the Morial case, which was the trigger, no pun intended, for the passing of this statute, was that government subunits and an increasing number of individual plaintiffs, begun by Wendell Turley in Dallas, who started these inherently dangerous products, that a firearm, because it can kill somebody, it can maim somebody, is defective and dangerous basically by that simple design. We've seen a manifestation of it in the Sandy Hook case. The common law cases were uniformly defeated, but some states, including Louisiana, knee-jerked and felt like they had to pass a statute to make it clear that we're not going to allow you simply to file a case because in a criminal act, somebody was shot, any more so than we're going to allow the municipalities to recoup their costs of police care and other public services that they incur because they have crime, gun crime. There was never any expectation or intent to limit a true product liability case. The two keys of the statute are Section B's inartful attempt, as consistent with the legislative intent, to add back in private causes of action, because what's really clear from subsection E is where they really did clarify that they only want to limit certain types of design claims. And in D, they actually tell specific types of design claims that they don't want to allow, such as what's called a chamber indicator, which tells a handler of a gun that when I've got a loaded gun, there's an indicator that says there is a cartridge in the chamber. They also wanted, they precluded, and these are probably efforts to regulate the gun industry, they precluded the kind of grip sensors that allow, where a handgun, for example, can only be used by the owner because the grip is sensitive to that individual owner's grip. Otherwise, you don't need, if you buy Remington's argument here, why do you need parts C, D, E, and F? If it was as clear and unambiguous as Remington claims in this case, all of those other provisions are superfluous, and the Remington wants to single out subpart B. Subpart B is confusing in itself because it's first unclear as to what is meant by others, and that is where Judge LaMalle first hung his hat with his analysis that the statute as a whole is ambiguous and yields absurd results because he made a threshold determination that the statute as a whole was ambiguous. The legislative history has further manifested in what they keep wanting to call the preamble, I just call it subsection A, makes it clear that their intent was to not allow people to sue for the improper use of a properly designed firearm. Now, Mr. Urquette went at great lengths to tell you what the facts of this case. What he didn't tell you is that this case is the product of over 40 years and hundreds of similar cases backed up by thousands of individual customer complaints of precisely this kind of defect. This is not a unique case, and their defenses of what your argument runs up against is whatever in artfulness, if that's even applicable here, to the phrasing of B in the reference to other person, it is as clear as it can be that there's no design statement in there. And I don't know what to make of legislative history on a Louisiana statutory interpretation, but there apparently was an effort that the briefing described, and it was mentioned again today, to add design in as an additional basis, and it was rejected. So regardless of whatever Judge LaMalle might have thought was ambiguous about this, the ambiguity is not on whether a design claim can be brought. Well, Judge, I would beg to disagree with you. Well, you need to, so tell me why. The reason I would disagree with you is because you can't just read B alone, because if B has the validity that you want to give to it, sir, then subsection D, for example, or chamber indicators, a design theory where you say you have to have a chamber indicator, or a design theory that says that you have to have a grip sensor, or in subsection E, where you are specifically now disallowing certain warning claims. Why do you need those if subpart B is as all-encompassing as argued by Remington? You have to read the statute as a whole, and clearly the statute as a whole is not trying to preclude all design claims, only certain design claims, and the legislative history is consistent with that, because Representative Scalise is clear when he says, you know, essentially that they want to preserve what would be traditional product liability claims. They just want to get rid of the ones for these general inherently defective, inherently dangerous types of theories that were prominent at the time. It was clearly an inartful attempt, but I think B was their inartful attempt to basically make clear that they did want to allow individual product liability claims. They just didn't do a very good job of drafting it, but you can tell through their discussions and through the other provisions, they really only wanted to preclude certain types of design claims, those that they did see and envision as true regulations of the gun industry. In any event... You're saying you could even, you could, a private citizen who injured another family member could sue notwithstanding what C, D, E, and F say? I'm not sure I'm following you, Judge. I'm sorry. You keep saying private causes of action. You keep qualifying it. So if a citizen injured a family member and they claimed the gun was defectively designed, could they, even though it might fall within C, D, E, or F, could a private party still... As long as they didn't fall into, for example, if I shoot my daughter and the theory that my daughter would then advance against Smith & Wesson, for example, is that I didn't have some kind of a grip sensor on the gun, clearly that type of cause of action is precluded by the statute. It has nothing to do with whether it's a private cause of action. It's just specific design defects. They're disallowing certain theories. They're not disallowing... Nothing unrelated to private action or not. They are preserving product liability intact, just as you would see generally... That's what I was, just want to make sure I understood you. Yes, yes, ma'am. I think the intent of the legislature... It has nothing to do with private action. As the Morial case, which doesn't really say a whole lot that I think is directly pertinent to this issue, they make it clear that they were clarifying the product liability statute. They weren't abrogating it with respect to firearms. They were clarifying it with respect to firearms. If you looked at an exhibit that we used in the trial court, and unfortunately I cannot remember the particular site to the record, about all they had to do to make every single provision appropriate and active with respect to this statute is instead of saying composition, is just say characteristic, which is the language in subsection .52. So the bottom line is that clearly the legislature in their legislative history had articulated a desire to preserve true, what I will call true product liability claims, those that would always have been recognized under subsection .52. And it's clear in what we have called here the preamble that that is the intent, is to only restrict certain types of claims, not traditional product liability claims, but those that would involve the improper use of a properly designed firearm. I use my Smith & Wesson to hold up the quick trip store and somebody sues Smith & Wesson claiming that they sold a defective product and there's nothing specifically about the functioning of that firearm that led to that untoward event. Unless the court has further questions, I have no further specific comment. Thank you, Your Honor. Thank you, sir. Mr. Erkin, you have five minutes on your button. Thank you very much, Your Honor. I wish you would address the word composition that is in B. How do you make that fit just with manufacture, with construction, unregionally dangerous construction? How do you make the word composition fit with that? Well, under the LPLA, a defect in manufacturing is under section .55, which is defined as a defect in construction or composition, which as under that statute is defined that the product must meet the manufacturer's own performance specifications and standards at the time it leaves the manufacturer's control. So the use of the word composition, Your Honor, I don't know why they specifically chose that, but that is the word they chose when they initiated it. Composition would seem to mean what materials, what something that the, whatever it is you're talking about is made of, which seems to be heading a little bit towards design, if not reaching it. So it seems to be a feature of design. What materials do you use? And those suits are being allowed. That's correct, Your Honor. If it's a defect in construction or composition, and again, I would put the word composition in quotes because I think it's sort of a term of art that's been used in the LPLA in the design, or excuse me, in the manufacturing defect context. That so long as that product left the manufacturer, design, excuse me, made exactly the way it was intended to be made according to the manufacturer's own performance specifications and standards, then there is no defect in construction or composition under that particular theory. Thank you. Go ahead. Thank you, Your Honor. I wanted to just specifically address, as I start here, one aspect of this. If the legislature had wanted to preserve a design defect claim in the way that Mr. Monzi says, then why not include a reference to Section 2800.56 in Subpart B exactly the way they did with Section 2800.55? If that was their intent, was to preserve a design defect claim, they could have easily done that. The reality is that's exactly the opposite of what they did. And the colloquy between Senators Hankel and Dardenne proves that. They specifically addressed under Section B whether they should also consider including another exception for design, and that never made it into the statute. And that makes perfect sense, because as you will generally allow design defects, you are generally allowing the possibility that other regulations could be enacted for a firearm through a court decision or through a jury verdict. Do you have any colloquy to support your interpretation of B and the meaning of third? Any other person? Sure, Your Honor. I'd be happy to share that with the Court. Well, I mean, was there anything in legislature, I mean, you talked about the particular colloquy that discussed adding design feature. Was there any discussion about whether any other person is talking about if you shoot yourself, you still have the claim? No, there isn't anything specific, Your Honor. It's a great question. There is nothing specific, and you can believe we scoured it, for anything in the legislative history that particularly indicates why in Section B they used the term shooting of another person. However, when you remember the context of this statute and why it was enacted in response to the Morial case, which involved the city trying to impose liability on gun manufacturers for shootings occurring between different people, it makes perfect sense that Section B was worded the way that it was, because they were trying to address shootings from one person to another person. So the fact that Section B is worded that way is really very consistent with what the intent was in responding to the Morial lawsuit. I've only got 45 seconds left. In conclusion, if you look at the plaintiff's brief, their whole case comes down to the following argument, that the letter of subsection B must give way to the spirit of Section 9, colon, 2800.60. But this spirit argument is fundamentally flawed in two ways. First, Louisiana Revised Statute 1, colon, 4 says that when the wording of a section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit. Here, the letter of this law could not be clearer. Second, if you look at that legislative history, the spirit behind this statute was clearly to curtail products liability actions against manufacturers, not to merely clarify that they still exist. So, in this case, we respectfully suggest that the district court should have granted summary judgment in favor of Remington and rejected the one on behalf of the plaintiff. Thank you. I'm happy to answer any other questions. That concludes our oral arguments for today. All the cases will be taken under advisement. And this panel will adjourn until 9 o'clock tomorrow morning.